UNSEALED

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| UNITED STATES *ex rel.*<br>NURDEEN MUSTAFA<br><br>     Plaintiff,<br><br>v.<br><br>SAMIR NAJJAR,<br><br>     Defendant. | Civil Action No. 8:10 CV 585-T 23<br>TBM |

## COMPLAINT

Plaintiff Nurdeen Mustafa, for his complaint against defendant Samir Najjar, alleges as follows:

### INTRODUCTION

1. This is an action to recover damages and civil penalties on behalf of the United States Government (the "Government") brought by plaintiff as a *qui tam* relator pursuant to the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA").

2. As alleged in more detail below, defendant knowingly made false statements material to, and in order to improperly avoid paying, a monetary judgment in the amount of $3,358,440 rendered against him by, and owed to, the Government in violation of 31 U.S.C. § 3729(a)(1)(G), also known as the "reverse-false-claim" provision of the FCA.

UNSEALED

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

4. This Court has personal jurisdiction over defendant because defendant resides, a substantial part of the events or omissions giving rise to this action occurred, and a substantial part of the property that is the subject of the action is situated, in the Middle District of Florida.

5. Venue is proper in this Court because defendant resides, a substantial part of the events or omissions giving rise to this action occurred, and a substantial part of the property that is the subject of the action is situated, in the Middle District of Florida.

## PARTIES

6. Plaintiff was formerly engaged as a real estate agent for defendant and currently resides at 3664 Market Street, Gotha, Florida. Plaintiff has personal knowledge – based on his involvement in negotiations for the purchase and sale of real property, preparation of transactional records, and conversations with defendant – of defendant's fraudulent representations to avoid paying the judgment owed to the Government

7. Defendant currently resides at 7700 Carriage Homes Dr., Orlando, Florida.

## FACTS

**Defendant's Efforts To Conceal His Assets Prior To And Following Entry Of The Government's Judgment Against Him**

8. Paragraphs 1 through 7 are incorporated herein by reference.

9. Defendant was formerly a physician practicing medicine in Jacksonville, Florida.

10. On September 30, 1999, defendant was charged by information by the U.S. Attorney's Office for the Middle District of Florida with filing false and fraudulent claims to the U.S. Department of Defense in connection with the Civilian Health and Medical Program of the Uniformed Services.

11. On April 4, 2000, in anticipation of the judgment that is required by his plea agreement, defendant executed a General Power of Attorney ("POA") in favor of his brother Lee Najjar, which gave Lee authority to execute documents and otherwise transact business on defendant's behalf.

12. On August 10, 2000, defendant pled guilty to the information and entered into a plea agreement with the U.S. Attorney's Office in which he agreed to serve thirty six (36) months in federal prison and pay criminal and civil monetary penalties, forfeiture, and restitution of $5,000,000.

13. The Court entered a judgment against defendant according to the terms of the plea agreement on April 27, 2001. As a result, defendant was ordered to pay the U.S. Attorney's Office a total amount of $5,000,000, in addition to serving prison time for filing false claims with the Government. Defendant apparently paid $1,641,560 of what he owed to the Government prior to entry of the judgment, leaving a $3,358,440 balance on the judgment.

14. Five days after entry of the judgment, on May 2, 2001, Lee Najjar, pursuant to the authority granted by the POA, executed two quitclaim deeds on behalf of his brother granting Lee title to two pieces of property that defendant owned in Duval County, Florida.

15. Ten days after entry of the judgment, on May 7, 2001, Lee Najjar executed another quitclaim deed on behalf of defendant, transferring ownership to a parcel of property in Clay County, Florida from defendant to Lee. Thus, within days of the entry of the judgment, two valuable pieces of property were conveyed from defendant to his brother.

16. Plaintiff's involvement with defendant began in 2004, after defendant had been released from prison. At the time, plaintiff was not aware of defendant's criminal past. Plaintiff was hired by defendant to represent him in connection with the purchase of certain commercial vacant land located on Goldenrod Road in Orlando, Florida (the "Goldenrod Property").

17. On June 14, 2004, a contract was executed between between T. Walter Brashier, the then owner of the Goldenrod Property and Lee Najjar for the purchase and sale of the property for $1,600,000. Title to the Goldenrod Property was transferred to LN Goldenrod LLC on or about September 17, 2004. LN Goldenrod LLC is a foreign limited liability company with its principal address located at 4475 Rivergreen Parkway, Suite 100, Duluth, Georgia 30096 and Lee Najjar is listed as its managing member. Lee Najjar resides in Atlanta, Georgia.

18. Plaintiff never had any communications with Lee Najjar during this transaction and the only person he dealt with was defendant. Indeed, plaintiff asked defendant, who he regarded as his client, why he wanted his brother's name on the contract and defendant told plaintiff that the Government had a judgment against him and he did not want his name to appear on the title for fear that his ownership interest would be discovered.

19. Defendant then engaged plaintiff to represent him in other real estate deals. For example, on or about October 1, 2004, defendant hired Global Realty Services of Central Florida, Inc. ("Global Realty"), a firm that plaintiff represented, to list the Goldenrod Property. Then, on or around January 6, 2005, defendant executed a vacant land contract on behalf of LN Goldenrod LLC to acquire certain real property located on Lost Lake Road in Clermont, Florida (the "First Lost Lake Property"). The escrow deposit for this property was paid via a check from Lee Najjar. LN Goldenrod LLC ultimately purchased the First Lost Lake property on February 25, 2005 for $250,000.

4

20.     On February 2, 2005, LN Goldenrod LLC purchased a condominium located at 7700 Carriage Homes Dr. in Orange County, Florida for $195,000 (the "Carriage Homes Property"). The Carriage Homes Property is defendant's private condominium.

### Defendant Perjures Himself To The U.S. Attorney In Order To Conceal His Assets To Avoid Paying The Government's Judgment Against Him

21.     On February 22, 2005, subsequent to the transactions described above, defendant's deposition was taken by an Assistant U.S. Attorney with the Financial Litigation Unit of the U.S. Attorney's Office For the Middle District, pursuant to a subpoena issued by that office. The purpose of the deposition was to determine the scope of defendant's finances in order to collect the balance of the $3,358,440 judgment awarded against him on April 30, 2001.

22.     During his deposition, defendant repeatedly lied to the Assistant U.S. Attorney in order to feign penury. For instance, when defendant was asked to provide his current address, he falsely stated that he resided in a rental unit located at 6854 Fallbrook, Apartment 308B in Orlando, Florida, as opposed to the Carriage Homes Property, where he actually resides.

23.     Defendant then went on to explain that the apartment is actually leased by his brother Lee Najjar and that defendant relies on his brother to provide him with rent money each month, which Lee gives to him in cash when he travels to Florida from Georgia or by money order sent to defendant via U.S. mail. Yet despite being his benefactor, defendant claimed that he could not recall with any specificity the last time he had seen his brother or where the meeting took place.

24.     Moreover, defendant completely denied having any knowledge of his brother's business dealings. As described above, however, defendant and his brother engaged in numerous real estate transactions together. Through the authority conferred to Lee Najjar via the POA, defendant had his

brother transfer title to three pieces of real estate from defendant's name to Lee's shortly after the judgment in the criminal action had been entered against him. Furthermore, defendant and his brother were both involved in LN Goldenrod LLC's acquisition of the Goldenrod, Lost Lake, and Carriage Homes Properties. Thus, defendant was clearly lying when he testified that he had no knowledge regarding his brother's business.

25. Defendant also testified that he had not been employed since early 2001 and that he survived off the approximately $1300 a month in cash he received from his brother to buy food, gas (for the Mercedes he drives which he claims is owned by his brother[1]), and to pay for the telephone bill[2] (although Samir testified that he used an unidentified friend's cellular phone, not his home phone, to contact his brother).

26. Defendant similarly testified that he has no investment income of any kind, no promissory notes, and no bank accounts.

27. Furthermore, defendant denied being affiliated with any corporate entities, including entities owned by his brother. Yet as noted above, defendant was clearly acting as a representative of LN Goldenrod LLC in order to facilitate the purchase of the Goldenrod, Lost Lake, and Carriage Homes Properties.

---

[1] Defendant testified that he could not recall the license plate number for this car or where he had parked it, except that it was parked far away from the location of his deposition.

[2] Defendant's testimony regarding the payment of the phone bill is inconsistent, since at one point he testified that his brother paid his phone bill for him with a check and later on he testified that he used the cash he received each month to cover the phone bill.

6

28. In sum, defendant, formerly a licensed physician for 18 years with an M.D. in pulmonary medicine and a Ph.D. pharmacology, proffered testimony that he was out of work, had no income or assets of his own, and that he lived in an apartment leased by his brother and survived solely on monthly cash disbursements from his brother.

29. This story was false. Defendant had real estate holdings of his own that he had transferred to his brother after the judgment was entered against him in the criminal action. And once he was released from prison, he started purchasing real property through the guise of a corporate entity called LN Goldenrod LLC with the assistance of his brother. Defendant was the brains and driving force behind these real estate transactions and his brother, Lee Najjar, was only involved to provide a cover so defendant's resources would not be discovered.

30. The U.S. Attorney's Office did not do any further investigation of defendant's finances following his deposition other than an occasional public records search. Accordingly, by making false statements to the Assistant U.S. Attorney at his deposition, defendant was able to avoid making payments on the judgment for $3,358,440.

**Defendant Continues His Fraudulent Scheme Of Sheltering His Assets By Using LN Goldenrod LLC And His Brother's Identity To Conduct Business**

31. After the deposition with the U.S. Attorney's Office, defendant resumed his fraudulent scheme of hiding his assets through setting up dummy corporate entities nominally owned by his brother, or by just using his brother's identity.

32. Described below are several of the transactions that plaintiff was either personally involved in or for which he has substantial knowledge that demonstrate defendant's scheme to shelter his assets to avoid the Government's judgment against him.

7

### The Second Lost Lake Property

33. On September 22, 2005, LN Goldenrod LLC entered into a contract to purchase another piece of real estate on Lost Lake Road in Clermont, Florida (the "Second Lost Lake Property") for $381,000.

34. Although the contract lists Lee Najjar as the agent of LN Goldenrod LLC, the contract was actually signed by defendant.

35. Moreover, the check for the $10,000 earnest-money deposit for the acquisition of the Second Lost Lake Property, which lists Lee Najjar as the holder of an account at Integrity Bank in Roswell, Georgia upon which the check is being drawn, was signed by defendant.

36. The sale of the Second Lost Lake Property was finalized on or about November 1, 2005.

### The Goldenrod Property

37. As mentioned earlier, plaintiff and Global Realty had been marketing the Goldenrod Property for defendant since October 2004. On March 24, 2005, LN Goldenrod, LLC entered into an agreement to sell the Goldenrod Property for $5 million. The contract was signed by defendant even though Lee Najjar was purportedly LN Goldenrod LLC's principal. This sale, however, ultimately fell through.

38. On October 1, 2005, defendant executed a Listing Agreement on behalf of LN Goldenrod, LLC, extending Global Realty's exclusive right to sell the Goldenrod Property until September 30, 2006.

39. On May 24, 2006, LN Goldenrod LLC entered into an agreement to sell the Goldenrod Property to Abdul Musa Ali for $4,500,000, with a $775,000 earnest-money deposit. The agreement was executed by defendant on behalf of LN Goldenrod LLC.

8

40. Abdul Musa Ali thereafter assigned his agreement to purchase the Goldenrod Property to Goldenrod Suid Properties, LLC. Goldenrod Suid Properties, LLC purchased the Goldenrod Property on June 15, 2006 and paid LN Goldenrod LLC an additional $1,600,000 at closing on top of the earnest-money deposit.

41. Thus, LN Goldenrod LLC received approximately $2,375,000 from the sale of the Goldenrod Property; the remaining approximately $2,125,000 of the purchase price went toward paying off preexisting liens and closing expenses.

42. So, contrary to defendant's testimony before the U.S. Attorney, at the time his deposition was taken he was engaged in marketing a valuable piece of real estate through a corporate entity that he operated – as evidenced by the October 1, 2004 Brokerage Relationship Disclosure with Global Realty described above – and eventually sold that property for a substantial profit.

### The Silver Star Property

43. On or about April 26, 2006, LN Goldenrod LLC entered into an agreement to acquire certain real property in Ocoee, Florida, referred to as the "Silver Star Property," from G & F Land Company. Although the agreement indicated that Lee Najjar would sign on behalf of LN Goldenrod LLC, it was in fact signed by defendant.

44. Then on May 9, 2006, defendant received a check for $100,000 from Bartow Village NS LLC for his "Silver Star Share %." This $100,000 was consideration in exchange for defendant's agreement to assign LN Goldenrod LLC's right to purchase the Silver Star Property. Defendant, therefore, was clearly acting as a principal of LN Goldenrod LLC by assigning contracts on its behalf and by personally receiving compensation in exchange for the assignment.

45.   In addition, on June 13, 2006, LN Goldenrod LLC entered into an agreement with Blessner Real Properties LLC to sell a portion of the Silver Star Property for $600,000. This contract lists Lee Najjar as the manager of LN Goldenrod LLC, but the contract was signed by defendant, further demonstrating that defendant was trying to hide his involvement in transactions conducted by LN Goldenrod LLC.

### The Groveland Farms Property

46.   On August 3, 2006, LN Goldenrod LLC entered into a contract to purchase 9.2 acres of vacant land in Lake County, Florida, referred to as the "Groveland Farms Property" for $1,750,000.

47.   The contract was signed by defendant, although Lee Najjar was listed as the buyer's agent in print. In a facsimile cover sheet to plaintiff, the seller's agent instructed with regard to the earnest-money deposit for the sale that "Dr. Naj[j]ar make his check on behalf of the LLC."

48.   And in a later facsimile cover sheet, the seller's agent requests that "Dr. Najjar" sign off on an addendum to the purchase agreement as president of LN Goldenrod LLC. The addendum was also signed by defendant, even though Lee Najjar was once again listed as LN Goldenrod LLC's agent.

49.   Finally, in an email dated January 17, 2007, the attorney representing defendant during the acquisition of the Groveland Farms Property stated that defendant would like to close on the purchase ahead of schedule and was willing to pay cash to purchase the property. This is further proof that defendant, not his brother Lee, was the one negotiating and fronting the money for LN Goldenrod LLC's acquisitions.

### The 34th Street Shopping Center

50.  - On September 8, 2006, defendant executed an agreement on behalf of himself or an assignee to acquire a shopping center located at 2900 South 34th Street, Saint Petersburg, Florida (the "34th Street Shopping Center").

51.  Then on September 21, 2006, defendant executed another contract to purchase the shopping center, but this time as an agent of LN Goldenrod LLC.

52.  Defendant ultimately backed out of the sale after a dispute over the value of the property and the seller thereafter sued defendant and LN Goldenrod LLC for specific performance on the contract. The lawsuit alleged that defendant unlawfully recorded a mortgage against the 34th Street Shopping Center for $1,600,000 in favor of LN Goldenrod LLC as the mortgagee.

53.  Most notably, the lawsuit makes clear that defendant is LN Goldenrod LLC's principal. Indeed, Lee Najjar is not even named in the lawsuit, despite the fact that he is listed as LN Goldenrod LLC's manager with Florida Department of State's Division of Corporations.

54.  The lawsuit was eventually settled. In July 2008, both defendant and Lee Najjar executed an agreement which stated that the owners of the 34th Street Shopping Center agreed to allow defendant to market the property and receive a percentage of the sale price as a commission for his services and that the mortgage in favor of LN Goldenrod LLC would also be paid in full from the sales proceeds. This agreement specifically states that defendant is LN Goldenrod LLC's principal.

### The Liberty VP, Byss Realty, and Alibrandi Road Contracts

55.  Three additional real estate transactions that defendant conducted, but used his brother or LN Goldenrod LLC as a front for, are the Liberty VP, Byss Realty and Alibrandi Road contracts.

56. On June 22, 2006, LN Goldenrod LLC entered into a contract to purchase real estate located at 0 West Eau Gallie Boulevard, Melbourne, Florida 32935 from Byss Realty LLC for $7,400,000. This agreement, like many of the other aforementioned agreements, listed Lee Najjar as the agent for LN Goldenrod LLC, but the contract was actually signed by defendant.

57. On June 23, 2006, LN Goldenrod LLC entered into an agreement to sell certain real estate located in Orange County, Florida to an entity named Liberty VP Goldenrod, LLC for $1,300,000. Defendant signed the agreement on behalf of LN Goldenrod LLC and Exhibit C to the agreement refers to defendant as LN Goldenrod LLC's vice president.

58. And on May 18, 2007, Lee Najjar purportedly executed a contract in which he agreed to acquire real estate located at 111 Alibrandi Road, Leesburg, Florida 34748. Yet the agreement was signed by defendant.

### The Other "LN" Entities

59. Defendant is using the following entities to shelter his assets the same way he did with LN Goldenrod LLC: LN Old Milton Parkway LLC, LN Citrus Grove LLC, LN Watertank Grove LLC, LN Groveland LLC, LN 411-Seminole LLC, LN Oakwater Lane Properties LLC, LN Oakwater Lane 2 LLC, LN Silver Star LLC, LN Bella Mare LLC, and LN Kensington Park LLC.

60. As was the case with LN Goldenrod LLC, all these companies are foreign entities whose principal place of business is 4475 Rivergreen Parkway, Suite 100, Duluth, Georgia 30096. And all are engaged in the purchase and sale of real property in Florida and list Lee Najjar as their managing member.

61. In fact, defendant's connection to the above entities is apparent because on December 28, 2006, LN Goldenrod LLC quitclaimed title to a piece of real property to LN Citrus Grove LLC.

62. And the property held by LN Kensington Park LLC is a five-bedroom, four-bathroom house that defendant purchased for his mistress, Lee Goldzweig.

63. Moreover, defendant's use of these entities to conceal his assets from the Government manifested itself when, on August 21, 2007, LN Old Milton Parkway LLC granted title, via limited warranty deed, to defendant and his wife Claire Najjar to certain real property located in Orange County, Florida.

64. Yet shortly thereafter, on October 5, 2007, the U.S. Department of Justice (DOJ) recorded a "Notice of Lien" against defendant for the outstanding judgment of $3,358,490 with the Orange County Comptroller's Office, which keeps a public record of all real property documents in Orange County.

65. Just a few months later, on May 29, 2008, defendant and his wife granted title to the property in Orange County back to LN Old Milton Parkway LLC. Accordingly, the transfers of the Orange County property between LN Old Milton Parkway LLC and defendant and his wife show not only that defendant was using these LN entities to hide his real property assets, but that when the DOJ attempted to enforce its judgment by recording a lien against his real property holdings, defendant transferred his property back to an LN entity to prevent the lien from attaching to his assets.

## VIOLATION OF THE REVERSE FALSE CLAIM PROVISION OF THE FCA 31 U.S.C. § 3729(a)(1)(g)

66. Paragraphs 1-64 are incorporated herein.

67. Defendant knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or

knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

68.   As a result, the Government suffered damages.

## PRAYER

WHEREFORE plaintiff prays for the following relief:

1.   An injunction requiring defendant to cease and desist from violating the FCA;

2.   Judgment against defendant in an amount equal to three times the amount of damages suffered by the Government;

3.   Civil penalties of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

4.   An award to plaintiff pursuant to 31 U.S.C. § 3730(d);

5.   An award of reasonable attorneys' fees, costs and expenses;

6.   Such other relief as the Court's deem just and equitable.

## JURY DEMAND

Plaintiff hereby demands a jury trial on all issues triable to a jury.

Respectfully submitted,

*/s/ Marguerite M. Longoria*

Sam J. Smith
Florida Bar No. 818593
Marguerite M. Longoria
Florida Bar No. 998915
BURR & SMITH LLP
442 W. Kennedy Boulevard
Suite 300
Tampa, Florida 33606
813.253.2010
813.254.8391 Fax
www.burrandsmithlaw.com

Jonathan K. Tycko
D.C. Bar No. 445851
Lorenzo Cellini
D.C. Bar No. 502441
TYCKO & ZAVAREEI LLP
2000 L Street, N.W., Suite 808
Washington, D.C. 20036
(202) 973-0900
(202) 973-0950 (fax)
jtycko@tzlegal.com

*For Plaintiff Nurdeen Mustafa*