# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**UNITED STATES OF AMERICA and
NURDEEN MUSTAFA,**

        **Plaintiffs,**

**v.**                                         **Case No:   6:10-cv-414-Orl-31DAB**

**SAMIR NAJJAR and LEE NAJJAR,**

        **Defendants.**

_____

# ORDER

     This matter comes before the Court without a hearing on the Motion for Relator Share

Award (Doc. 256) filed by the Relator, Nurdeen Mustafa ("Mustafa" or the "Relator"), the

response in opposition (Doc. 257) filed by the United States of America, and the replies (Doc.

260, 263) filed by both parties.

## I.    Background

     Samir Najjar owed several million dollars to the United States.   To avoid paying, he and

his brother, Lee Najjar, transferred real estate owned by Samir into Lee's name.   Though he

retained control of the assets, Samir then lied to the Government, saying he could not afford to pay

his debt.

     Mustafa, a real estate agent, learned of the scheme.   On March 8, 2010, he filed a single-

count suit (Doc. 1) under the False Claims Act, 31 U.S.C. § 3729, which prohibits making false

statements to avoid paying an obligation to the Government.   Mustafa identified numerous

parcels of real estate that Samir and Lee Najjar had hidden from the Government, and explained

the roles played by each brother in doing so.   However, Mustafa named only Samir as a defendant.[1]

The United States intervened in the proceedings on April 18, 2011.   (Doc. 2)   On October 4, 2011, the Government filed, under seal, its own complaint in intervention (Doc. 84).   The Government's complaint tells essentially the same story as Mustafa's original complaint, though with some additional details.   The Government also named Lee as a defendant, and added a fraud count and a conspiracy count to Mustafa's reverse-false-claims count.

Eventually, the Government, Samir, and the Relator entered into a settlement.   Among other terms, the parties agreed (1) to the entry of a $10.1 million judgment against Samir and (2) that the Relator was entitled to a 20 percent share of any money collected from Samir – including any assets obtained from Lee but equitably owned by Samir – pursuant to the judgment.   The Government entered into a separate settlement agreement with Lee, under which Lee agreed to pay $250,000.   By way of the instant motion, the Relator claims entitlement to a share of that settlement.

## II.   Legal Standards

Passed in 1863 in an effort to combat profiteering by Union Army suppliers during the Civil War, the False Claims Act ("FCA") prohibits false or fraudulent claims to government payment.   *See United States ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1496 (11th Cir. 1991). Of particular relevance to the instant case, the Act also prohibits making false records or statements that are material to an obligation to pay money to the United States.   31 U.S.C. § 3729(a)(1)(G).

---

[1] The Relator has offered no explanation for his decision not to name Lee as a defendant.

The FCA authorizes civil actions to remedy such conduct, which may be brought by the Attorney General, 31 U.S.C. § 3730(a), or by private individuals in the Government's name, § 3730(b)(1).   The latter are known as "qui tam" suits.   Individuals who violate the FCA are liable for civil penalties of $5,000 to $10,000 for each violation plus up to three times the amount of damages suffered by the Government.   § 3729(a)(1) & (2).   When an FCA suit is brought by an individual, the Government has the right to intervene and take control of the action. § 3730(b)(2) & (c)(1).   The Government may also choose to pursue alternate remedies, such as administrative proceedings to determine a civil money penalty.   § 3730(c)(5).

Where the Government intervenes and the suit is successfully concluded, the FCA provides that the individual initiating it – known as the "relator" – is entitled to an award[2] of "at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim" plus reasonable attorneys' fees and costs.[3]   31 U.S.C. § 3730(d)(1) (emphasis added).

> It has been noted that "'[t]he purpose of the qui tam provisions of the False Claims Act is to encourage private individuals who are aware of fraud being perpetrated against the Government to bring such information forward.'"   *United States ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 18 (2nd Cir.1990) (quoting H.R.Rep. No. 660, 99th Cong., 2d Sess. 22 (1986)) (citing Senate Report at 14, 1986 U.S.Code Cong. & Admin.News 5279 (quoting testimony before Senate Judiciary Committee's Subcommittee on Administrative Practice and Procedure stating that the amended False Claims Act rewards those who "bring ... wrongdoing to light.")).

*United States ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1497 (11th Cir. 1991).

---

[2] Such an award is often referred to as a "relator's share".

[3] Under certain circumstances, the amount of the relator's share may be reduced.   For example, where the relator's claim is primarily based on certain types of publicly disclosed information, the relator's share is limited to ten percent.   31 U.S.C. § 3730(d)(1).

III.     Analysis

Simply stated, the parties disagree as to whether the $250,000 to be paid by Lee Najjar represents "settlement of the claim" brought by Mustafa, thereby entitling him to a relator share under 31 U.S.C. § 3730(d)(1).   The Government argues that Mustafa only asserted a claim against Samir Najjar.   Mustafa responds that his complaint, though naming only Samir Najjar as a defendant, included all of the information needed to assert a claim against Lee, such as the role he played in the conspiracy to hide Samir's assets from the Government.[4]

This appears to be a question of first impression within this Circuit.   The FCA itself does not define the parameters of an "action" or a "claim" for purposes of determining the relator's share.   The Government relies on a line of cases holding that, despite the use of the term "action" in that section, the relator's complaint must be evaluated on a claim-by-claim basis to determine whether he or she is entitled to a share of any settlement.

For example, in *U.S. ex rel. Merena v. SmithKline Beecham Corp.*, 205 F.3d 97 (3d Cir. 2000), a number of relators filed suits against SmithKline Beecham Corp. ("SKB").   The relators asserted that SKB had engaged in several schemes to defraud the Government, including one – known as the "automated chemistry" scheme – that had been under investigation and publicly reported prior to the filing of the relators' complaints.   *Id.* at 99-100.   After intervening, the Government reached a settlement with SKB regarding a number of the schemes outlined by the relators, including the automated chemistry scheme.   *Id.*

_____

[4] Mustafa also argues that the instant case is analogous to one in which the Government opted to pursue an alternative remedy, such as an administrative hearing.   *See* 31 U.S.C. § 3730(c)(5).   In such cases, the relator has the same rights to a share as if the case had been resolved via litigation or settlement.   *Id.*

The relators argued that they were entitled to a share of the entire settlement, but the Government argued that the relators' claims regarding the automated chemistry scheme were barred by the public disclosure bar of 31 U.S.C. § 3730(e)(4),[5] and therefore the relators were only entitled to a share of that portion of the settlement attributable to other claims raised in their complaints.  *Id.* at 100.   The district court read Section 3730(d)(1) as treating the relator's "action" or "claim" as a single entity, such that whenever the Government intervened in an action, the relator would be entitled to a share of whatever settlement the Government might subsequently reach.  *Id.* at 101.   The appellate court rejected this interpretation, finding that the language of the statute and common practice indicated that relators' complaints were divisible and should be subjected to claim-by-claim analysis when determining entitlement to a relator's share.  *Id.* at 102.

Upon analyzing the claim regarding the automated chemistry scheme, the appellate court concluded that awarding a share to the relators would not be in keeping with the purposes behind the Act:

> [T]he relators' position produces results that we do not think that Congress intended.   First, this interpretation provides a potentially huge windfall – 15–25% of the total recovery – for most relators whose claims would have been dismissed under section 3730(e)(4)

---

[5] Section 3730(e)(4) provides that the court

> shall dismiss an action or claim [being prosecuted by a relator) if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed –
>
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agents is a party;
>
> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
>
> (iii) from the news media.

if the government had not intervened. It is hard to see why Congress might have wanted the fortuity of government intervention to make such a difference – or why Congress might have wanted to provide such a large reward to such a relator, who provides little if any public service.  *See Federal Recovery Services, Inc. v. United States*, 72 F.3d 447, 452 (5th Cir.1995) (describing a similar interpretation as "ignor[ing] the False Claims Act's goal of preventing parasitic suits based on information discovered by others" and as requiring awards in "even those [suits] brought by individuals who discovered the defendant's fraud by reading about it in the morning paper").

Second, the relators' interpretation prescribes the same range of awards – 15–25% – for two very dissimilar groups of relators:  first, those relators who provide a substantial public service by bringing claims that are not based upon publicly disclosed information and, second, relators who furnish little if any public service because their claims are "based upon" publicly disclosed information and would have been dismissed under section 3730(e)(4) if the government had not intervened.   It seems unlikely that Congress wanted these two vastly different types of relators to be treated the same.

*Id.* at 105.

Although it is a close question, the Court finds that the purposes behind the False Claims Act counsel in favor of an award to the Relator here.   Unlike the relators in *Merena* and similar cases cited by the Government, Mustafa is not an individual who has provided "little if any public service."   Mustafa is the individual who filed the FCA suit that brought the full extent of the fraudulent conduct of Lee Najjar to the Government's attention.

Though most of his complaint is concerned with the activities of Samir Najjar, Mustafa also identified Lee Najjar and described a number of ways he participated in the scheme to hide his brother's assets.   For example:

On April 4, 2000, in anticipation of the judgment that is required by his plea agreement, [Samir Najjar] executed a General Power of Attorney ("POA") in favor of his brother, Lee Najjar, which gave Lee authority to execute documents and otherwise transact business on [Samir Najjar's] behalf.

…

Five days after entry of the judgment, on May 2, 2001, Lee Najjar, pursuant to the authority granted by the POA, executed two quitclaim deeds on behalf of his brother granting Lee title to two pieces of property that [Samir Najjar] owned in Duval County, Florida.

Ten days after entry of the judgment, on May 7, 2001, Lee Najjar executed another quitclaim deed on behalf of [Samir Najjar], transferring ownership to a parcel of property in Clay County, Florida from [Samir Najjar] to Lee.   Thus, within days of the entry of the judgment, two valuable pieces of property were conveyed from [Samir Najjar] to his brother.

(Doc. 1 at 3).

Continuing, Mustafa described Lee Najjar's participation in other deals orchestrated by his

brother, including one involving vacant land in Orlando known as the "Goldenrod Property":

On June 14, 2004, a contract was executed between T. Walter Brashier, the then-owner of the Goldenrod Property and Lee Najjar for the purchase and sale of the property for $1,600,000.   Title to the Goldenrod Property was transferred to LN Goldenrod LLC on or about September 17, 2004.   LN Goldenrod LLC is a foreign limited liability company with its principal address located at 4475 Rivergreen Parkway, Suite 100, Duluth, Georgia 30096 and Lee Najjar is listed as its managing member.   Lee Najjar resides in Atlanta, Georgia.

Plaintiff never had any communications with Lee Najjar during this transaction and the only person he dealt with was [Samir Najjar]. Indeed, plaintiff asked [Samir Najjar], who he regarded as his client, why he wanted his brother's name on the contract and [Samir Najjar] told plaintiff that the Government had a judgment against him and he did not want his name to appear on the title for fear that his ownership interest would be discovered.

[Samir Najjar] then engaged plaintiff to represent him in other real estate deals.   For example, on or about October 1, 2004, [Samir Najjar] hired Global Realty Services of Central Florida, Inc. ("Global Realty"), a firm that plaintiff represented, to list the Goldenrod Property.   Then, on or around January 6, 2005, [Samir Najjar] executed a vacant land contract on behalf of LN Goldenrod LLC to acquire certain real property located on Lost Lake Road in Clermont, Florida (the "First Lost Lake Property").   The escrow deposit for this property was paid via a check from Lee Najjar.   LN

> Goldenrod LLC ultimately purchased the First Lost Lake property
> on February 25, 2005 for $250,000.

(Doc. 1 at 4).   The remainder of the pleading continues to describe real estate transactions controlled by Samir Najjar in which Lee Najjar served as a figurehead.   (Doc. 1 at 5-12).

The Government does not dispute the Relator's contention that its settlement with Lee Najjar covers the conduct revealed in Mustafa's complaint.   In addition, the Government does not dispute the Relator's contention that he could have amended his complaint to add Lee Najjar as a defendant, but that he lost the ability to do so once the Government intervened.

It is true that, in revealing the brothers' misconduct, Mustafa named only Lee Najjar's co-conspirator as a defendant.   However, the Court does not find that this should invalidate Mustafa's service.   "A primary purpose of the FCA is to encourage whistleblowers to come forward with allegations of fraud perpetrated upon the government and to reward them when they do so."   *Roberts v. Accenture, LLP*, 707 F.3d 1011, 1018 (8th Cir. 2013) (awarding relator's share of settlement based on misconduct of which relator had been unaware, because relator's allegations prompted defendant to reveal that misconduct to the Government).   In substance, though not necessarily in form, Mustafa acted in accord with the purpose of the FCA.   In this (unusual) factual circumstance, the Court finds that Mustafa is entitled to a relator's share.

He argues for a 20 percent share, the same fraction the Government agreed that he was entitled to in regard to the settlement with Samir Najjar.   The Government has not offered an

argument in support of some other figure in regard to the settlement with Lee Najjar.

Accordingly, the Court finds that Mustafa is entitled to a 20 percent share.

In consideration of the foregoing, it is hereby

**ORDERED** that the Motion for Relator Share Award (Doc. 256) is **GRANTED**, and the

Relator, Nurdeen Mustafa, is awarded twenty percent of all amounts collected pursuant to the

settlement agreement between the Government and Lee Najjar in the instant case.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on July 30, 2015.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party